Filed 4/30/26  P. v. Ash CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085435 |
| Plaintiff and Respondent, | (Super. Ct. No. SCN453879) |
| v. | |
| WILLIAM CHARLES ASH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Victor Torres, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Christopher P. Beesley and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted William Charles Ash of sexually assaulting and raping his daughter, Jane Doe, when she was between the ages of 11 and 16.  The charges were brought over 20 years after the abuse ended, when Doe reported

the crimes to police. In addition to the guilty verdicts, the jury also found true allegations that tolled the statute of limitations. After the convictions, the trial court sentenced Ash to 18 years in prison.

On appeal from the judgment of conviction, Ash asserts the trial court erred by instructing the jury that a sexual assault conviction may be based on the testimony of the complaining witness alone, and that a single witness's testimony can prove any fact. Ash also argues the statute of limitations instruction misstated the law concerning the clear and convincing evidence required to corroborate Doe's testimony for purposes of the statute of limitations. Ash's arguments confuse the legal requirements for tolling the statute of limitations with the separate legal requirements that apply to the criminal allegations levied against him. As we shall explain, we reject Ash's appellate contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Doe was born in the Philippines in 1985. Five years later Doe, her parents, and her two younger brothers, M.A. and E.A., moved to San Diego. Doe's mother left the family and was not present when Doe was growing up. Ash, told Doe that her mother left because she did not want to participate in her life. Doe and her siblings were raised in unstable circumstances. Ash moved the family frequently. At times they lived in hotels, and at other times they slept in campgrounds and in Ash's car. Ash also exposed his children to nudity and sex. He took the children to nude beaches, worked as a nude model, and had sex in front of his children. Ash told his children it was healthier for them to sleep in the nude.

A. *Testimony of Joya*

In 1996, Ash began a romantic relationship with Joya, a 20-year-old teacher's aide in M.A.'s second-grade class. Joya was 17 years younger than

2

Ash. Joya enjoyed Ash's company and was attracted to him, but was suspicious of him and did not understand why he was not a better provider for his children. Joya's relationship with Ash was tumultuous and Joya testified that Ash used his children to manipulate her. When Joya met Ash, he was dating another woman, Joey. From the fall of 1996 through June 1997, Ash and his children lived in Joey's home. Joey wanted to help the children, give them a home, and ensure they had consistent schooling. Around January 1997, Joya got pregnant and moved in with Joey, Ash, his three children.

When Joya and Ash had sex, the children were usually in the other room, but the boundaries were loose and the children witnessed them having sex. On one occasion, Joya and Ash were having sex in Joey's house while Doe was crouched at the bed holding Joya's arm. Joya motioned for Doe to leave. When Joya asked Ash why that happened, he said he "thought [Doe] was curious, and he wanted to show her what he was doing." Joey was evicted from the house in June 1997, and Ash and the children moved in with Ash's mother in Encinitas. Joya returned to Los Angeles to give birth in September 1997.

Thereafter, Ash's mother bought him a home at a mobile home park in Carlsbad. Joya often visited Ash and the children for extended periods. During one of these visits, Joya and Ash were becoming intimate when Doe appeared in the doorway. Ash motioned for Doe to come to him, then lifted her onto the bed and removed her clothes. While Doe was lying next to Joya, Ash licked her bare chest and her nipples. Joya testified that Doe looked scared. Joya said, "I'm not comfortable with this," and got up and left. Joya had not seen anything sexual between Ash and his daughter before and she was surprised and disgusted. Ash followed Joya angrily and stated, "it's not

like this happens every day." Joya was very upset and drove to her father's home to Los Angeles.[1]

A few weeks later, in September 1998, Joya contacted child protective services (CPS) and reported what had happened. Joya waited to report the incident because she was fearful that Ash would harm her. Joya also called Ash's sister and left a message on her answering machine asking her to look out for Doe because of what she had seen. Joya continued to talk with Ash over the phone, and eventually told him she had contacted CPS and told his sister about the abuse, and that she wanted him to stop abusing the children. Joya testified that Ash was furious, and their relationship ended.

In October 1998, Ash appeared at Joya's father's house in Los Angeles. Joya was asleep with her son when she woke up to Ash standing at the foot of their bed. Half awake, Joya asked Ash if he was there, and he told her to go back to sleep. She fell back asleep and Ash took their son out of the bed and carried him to the opposite end of the house where the child started to scream, waking Joya's younger sisters. Ash fled the house and Joya's sister found the child and brought him back to her. The next morning, Joya's sisters were mad at her and asked how her son got to the other side of the house. Inside their mailbox were children's books and parenting books. They deduced that Ash had been there and had carried the child across the house. Joya believed that Ash might have been trying to kidnap the child and reported the incident to the police. She did not see Ash after this incident.

---

[1]    Joya also testified she wanted to protect Doe and her brothers from Ash because she had witnessed him lose his temper with his children. Once he was so mad at Doe, he held her above his head and threw her into the unheated pool in winter and made her tread water as he yelled at her for at least 20 minutes.

4

B. *Doe's Testimony*

Doe was 11 years old when her family moved to Carlsbad. She lived there until Ash kicked her out at age 17. This was also where the sexual assaults occurred. Doe testified she remembered the time Ash called her to come to the bed while he and Joya were having sex. She recalled Ash pulling her shorts down, removing her tank top, and telling her to lie down. When he tried to grope Doe, Joya jumped up. Joya seemed startled and left the house. Soon thereafter the police came to Doe's school and asked her about the incident. Doe told the jury she spoke with CPS more than 15 times over the years but was never truthful.

Doe testified that in addition to perpetrating sexual abuse, Ash physically abused her and her two brothers. He would headbutt them, and if they cried, he would do it again. Ash also used a "boo boo stick," which was a bamboo stick, to punish them. Doe testified that Ash knew how to hit the children with his knuckles to avoid leaving bruises or marks. Ash threw the children on the couches made mostly of wood to hurt them and several times used a taser gun to threaten them. Doe recalled seeing him use the taser on one of her brothers and another time she remembered Ash throwing her brother into a pool naked and holding him underneath the water, causing him to gasp for air. Ash would also threaten to hurt his children if they told anyone about the physical punishment.

Doe recalled being sexually abused by her father on eight to ten occasions. The first instance occurred when she was 11 years old. That day, Ash was in his bedroom masturbating to porn and he made Doe lie down next to him naked. Ash opened her legs, put his mouth on her vagina, and asked her if it felt good. Doe did not believe she could tell Ash to stop and did as she was told. She feared physical abuse if she did not comply. Ash put his

mouth on Doe's vagina more than once and she recalled the conduct occurred in the living room when she was home sick from school and alone with Ash. Ash also inserted his fingers inside her vagina. Once, when Doe was doing dishes, he put his hands in her shorts and rubbed her vagina.

On another occasion, Ash was masturbating to porn and told Doe to lie down on the floor and made her touch his penis with her hand. Ash also tried to put his penis inside her mouth, but she kept her mouth clenched shut, so he rubbed his penis on her face. She recalled he also rubbed his penis against her vagina, and ejaculated on her stomach. Doe testified that on another occasion, Ash inserted his penis into her vagina while she lied naked on the floor and that he also rubbed her clitoris and vagina with his thumb and fingers. She testified that she tried to push him off but was unable to do so. Doe started crying, but he did not stop.

Afterwards they took a shower, which was common after the abuse. Ash asked Doe if it hurt down there and when she said it did, he took her to the store to buy feminine products even though she was not menstruating yet. Ash also told his daughter that he needed to show her how to be loved so that no one could hurt her.

Ash taught Doe and her siblings not to trust the police. When Doe was under Ash's authority, she believed if she reported the abuse, the police would tell Ash and she would be punished. Doe believed no one cared about her.

C. *Testimony of Laurie & Christi*

Laurie and her son Ryan moved into the mobile home park where Doe and her family lived in 2002. Ryan and Doe met and started dating in the fall of that year when Doe was 17. Ash introduced himself to Laurie because

6

Doe and Ryan were dating. Christi also moved into the mobile home park in 2002 and became good friends with Laurie. Christi eventually married Ash.

At first Laurie had no issue with Ash, but he later began to do things that bothered her. For example, Ash once thought a neighbor stole one of his marijuana plants, so he walked by the neighbor's house with a baton, running it along the fence and snapping it on his hand. Laurie also saw Ash slap Christi's son when he was about 10 years old. Laurie was also disturbed by Ash after she saw him walk behind Doe, with an erection, then grab her butt cheeks and call her nectar buns.

Laurie was fond of Doe. She testified Doe was sweet, loved her brothers, made Ryan happy, and was an overall nice kid. When Doe and Ryan began having sex, Laurie took Doe to Planned Parenthood to get birth control and Doe discovered she had a sexually transmitted infection, human papillomavirus (HPV). Doe knew Ash had infected her with HPV because he was the only person with whom she had engaged in sexual intercourse. She told Ryan about the abuse, and Ryan told Laurie.

Ash and Christi were married the same year that Ryan and Doe began dating. When Ash and Christi were on their honeymoon, Ryan asked to speak with Laurie in confidence. Ryan told his mother that Ash had been molesting Doe since she was very young. Thereafter, Laurie spoke to Doe briefly about the abuse. Doe told Laurie that Ash had stopped the abuse when she started seeing Ryan. Doe was adamant that Laurie not tell anyone because she feared her younger brothers would be taken away.

Christi testified that she and Ash were married for 20 years, from 2003 to 2023. In 2002, Christi moved into the same Carlsbad mobile home park where Doe and his children lived. Christi met Ash through Laurie, who was her next-door neighbor, and married him the following year.

7

The day after Ash and Christi returned from their honeymoon, Doe told Christi that Ash did not love her, and he just used women for their money. Doe also told Christi that she had found her birth mother. That evening, Christi told Ash what Doe had told her. When Ash learned what Doe had said, he woke her up, grabbed her by the arm, and told her to get out of his house. Doe was hysterical and begged Ash to let her stay. Ash refused, and his sister came to the home and picked up Doe.

Christi testified that she did not witness sexual or physical abuse, but she was aware that Ash's children feared him. She did frequently hear Ash verbally threaten "to beat the shit out of" the children.

A few weeks after Ash kicked Doe out of the house, Laurie told Christi about the sexual abuse. When Christi confronted Ash, he claimed Doe was just saying those things because he had kicked her out of the house.

Christi testified she spoke with Doe on the phone a few days after Laurie told her about the abuse, and Doe told her Ash had molested her. Doe was upset and crying, and told Christi the abuse started when Ash looked at her in the bathroom under the door. When Christi asked for more details, Doe said she could not talk about it. Christi testified that after her conversation with Doe, Ash convinced her that Doe was trying to hurt him and that he was her victim. Christi wanted her new marriage to work and moved past the allegations. At trial, however, she told the jury there were red flags that she ignored. She said Ash always called Doe "nectar buns," and she had a weird feeling once when she saw Doe applying makeup to Ash.

Christi testified that in 2020 she saw a message from Doe to Ash on Facebook that Doe had written to him in 2013. Christi said the message from Doe said he had messed her up, and one day she would have justice. Doe wrote, "Don't you remember when I was bleeding from, you know, being

8

inside of me and you put me in the shower and cleaned me up and told me I started my period?" Ash responded, "Fuck you. You're a whore and a slut, and you became a stripper. And you ruined your own life. You're not going to ruin mine."

After Christi's marriage to Ash ended in 2023, Christi called Doe to tell her she was divorcing Ash. Christi also contacted Laurie and told her she was divorcing and Doe had been in touch with the police about the abuse.

D. *Doe's Report to Police*

On May 1, 2023, at age 37, Doe contacted the Carlsbad police. An officer took a report from Doe over the phone. Doe reported child molestation and rape that occurred when she was a child. Doe told the officer her father molested her from a young age and raped her when she was 16 or 17 years old. She said she had been afraid to report the abuse because Doe threatened her. Doe received a call from a detective a week later and the investigation culminated in the underlying charges.

E. *Expert Testimony on Child Abuse Disclosure*

Christina Shultz testified as an expert on the dynamics and patterns of disclosure of child sexual abuse. Shultz stated that many victims do not disclose their abuse right away, and that many will delay years, even decades, to disclose abuse. Most victims of child abuse know the perpetrator and the relationship impacts their disclosure. The decision to disclose is dependent on many factors, including loyalty, shame, embarrassment, violence and the belief the victim will get in trouble or break-up his or her

9

family.  Teenagers usually disclose to a friend or peer their age, whereas younger children most often tell a parent.

F. *Defense Case*

Ash took the stand in his own defense.  He denied having any sexual contact with or molesting Doe.  He testified he is attracted to adult women, not children, and has never had HPV.  Ash stated he never licked Doe in Joya's presence, nor did he go to Joya's family home in the middle of the night.  When he returned from his honeymoon and found out Doe had taken her brothers to see their mother, he kicked Jane Doe out of the house.

Ash testified his marriage to Christi ended because she was drinking heavily and her health was deteriorating.  When he was finalizing the divorce, he received a call from Doe saying she was tired, sick and was not getting treatment, and she forgave him for what he had done to her.  He did not hurt her, nor had he ever hit any of his children with a stick.  Ash admitted he watched porn occasionally and said he always closed the doors when he was having sex.  Ash said that Joya made up the events with Doe because she was mad at him for sending letters to a man she was dating. Ash did not recall the incident in which he had an erection and grabbed Doe's butt.

G. *Conviction and Sentencing*

After deliberations, the jury found Ash guilty of continuous sexual abuse of a child (Pen. Code, § 288.5, subd. (a))[2] and forcible rape (§ 261, subd. (a)(2)).  The jury also found true allegations that the offenses involved acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules

---

[2]     Subsequent undesignated statutory references are to the Penal Code.

of Ct., rule 4.421(a)(1)), the victim was particularly vulnerable (*id.*, rule 4.421(a)(3)), and that the statute of limitations was tolled (§ 803, subd. (f)).

Thereafter, the trial court sentenced Ash to 18 years in prison.

## DISCUSSION

Ash asserts the trial court erred by instructing the jury with CALCRIM No. 301, which states the testimony of one witness can prove any fact, and CALCRIM No. 1190, which states that a sexual assault conviction may be based on the testimony of a complaining witness alone. Specifically, he asserts the instructions were improper because they allowed the jury to toll the statute of limitations without finding the existence of clear and convincing corroborating evidence as required by section 803, subdivision (f)(2)(C).

Ash also argues the trial court provided an improper instruction on the statute of limitations because the definition of corroborating evidence provided to the jury undermined the requirement that the jury find such evidence by clear and convincing proof.

## I

### *Additional Background*

At the jury instruction conference, Ash's defense counsel argued CALCRIM No. 1190 was inappropriate in this case because the jury needed to find corroborating evidence of the abuse by clear and convincing evidence to convict Ash of the crimes. Defense counsel conceded that normally a conviction could be based on the testimony of one witness, but argued here the conviction could not be based on Doe's testimony alone because the jury also needed to find the statute of limitations was tolled. Ash's counsel suggested modifying CALCRIM No. 1190 to state that " 'a conviction of a

sexual assault crime may not be based on the testimony of a complaining witness alone.' "

The prosecutor disagreed, asserting the instruction was appropriate, and not confusing, because the jury could find Ash guilty of the sex offenses based on Doe's testimony alone. He explained that if the jury convicted Ash of the offenses it was required to separately address whether the evidence also supported tolling the statute of limitations. The court agreed with the prosecution, concluding there was no need to modify the instruction. The court noted the verdict forms required the jury to find guilt on each count and to make a separate finding on the statute of limitations allegation.

Thereafter, the trial court instructed the jury with CALCRIM No. 301, which stated, "Unless I instruct you otherwise, the testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." The court also gave CALCRIM No. 1190, which stated, "Unless I instruct you otherwise, conviction of a sexual assault crime may be based on the testimony of a complaining witness alone." After these instructions, the court instructed the jury on the crimes of continuous sexual abuse of a child under 14 (CALRIM No. 1120) and rape by force, fear, or threats (CALCRIM No. 1000).

The court then instructed the jury on extending the statute of limitations under section 803, subdivision (f)(2)(C). The instruction provided, "The People have the burden of proving the defendant is guilty of the charged offenses beyond a reasonable doubt. The elements the People need to prove beyond a reasonable doubt for each offense are explained in the instructions defining each offense. [¶] If you find the defendant guilty of the crimes charged in Counts One and/or Two, pursuant to Penal Code section 803(f),

12

you must then decide whether, for each of those crimes, the People have proved the following factual allegations by a preponderance of the evidence for elements One through Three, and by clear and convincing evidence for element Four: [¶] (1) On May 1, 2023, Jane Doe reported to a California law enforcement officer that she, while under the age of 18, was a victim of the charged offenses. [¶] (2) A complaint accusing the defendant of the crimes was filed on March 27, 2024, within one year of the victim's report. [¶] (3) The crimes involved 'substantial sexual conduct.' [¶] *Substantial sexual conduct* means penetration of the vagina or rectum of the victim or offender by the other person's sexual organ, finger, or any foreign object, oral copulation, or masturbation of either the child or the perpetrator. [¶] *Oral copulation* is any contact, no matter how slight, between the mouth of one person and the sexual organ or anus of another person. Penetration is not required. [¶] *Masturbation* is defined as the touching of another person's genitals. [¶] (4) There is independent evidence, not including the opinion of a mental health professional, that corroborates Jane Doe's allegation."

The instruction continued, "Proof by a preponderance of the evidence is a different standard of proof than proof beyond a reasonable doubt. To meet the burden of proof by a preponderance of the evidence, the People must prove that it is more likely than not that the fact is true. You should consider all of the evidence bearing upon this issue, regardless of who produced it. [¶] If the People have not met the burden of proving each of the above allegations by a preponderance of the evidence, you must find that the allegations have not been proved. [¶] You must also decide whether, for each crime the People have proved, there is independent evidence, not including the opinion of a mental health professional, that clearly and convincingly corroborates Jane Doe's allegation. [¶] Corroborating evidence is evidence that tends to connect

13

the defendant with the commission of the crime. Corroborating evidence need not be strong or even enough to establish each element by itself. Corroborating evidence may include any circumstance that tends to connect him to the crime. [¶] Clear and convincing evidence of the corroboration means evidence of such convincing force that it demonstrates, in contrast to the opposing evidence, a high probability of the truth of the facts for which it is offered as proof. Such evidence requires a higher standard of proof than proof by a preponderance of the evidence. [¶] If the People have not met the burden of proving this allegation by clear and convincing evidence, you must find that the allegation has not been proved."

## II

### *Legal Standards*

In determining whether jury instructions correctly state the law, we apply the de novo standard of review. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) "The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*Ibid.*) Moreover, "[i]nstructions should be interpreted … to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) This court presumes jurors are intelligent and capable of understanding and applying the instructions they are given. (*People v. Myles* (2012) 53 Cal.4th 1181, 1212.) This court "also must consider the arguments of counsel in assessing the probable impact of the instruction." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

In addition, "[a]s a general rule, failure to object to an instruction forfeits the issue on appeal." (*People v. Campbell* (2020) 51 Cal.App.5th 463,

14

489; see also *People v. Souza* (2012) 54 Cal.4th 90, 120; but see *People v. Taylor* (2010) 48 Cal.4th 574, 630 [defendant did not forfeit challenge to jury instruction by failing to object when his substantial rights are affected].)  A defendant's objection at trial must be specific to the grounds asserted on appeal.  (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 20.)

III

*CALCRIM No. 301 and CALCRIM No. 1190*

As stated, the trial court instructed the jury with CALCRIM No. 301 that, "[u]nless I instruct you otherwise, the testimony of only one witness can prove any fact."  The court further instructed with CALCRIM No. 1190 that, "[u]nless I instruct you otherwise, conviction of a sexual assault crime may be based on the testimony of a complaining witness alone."  Both instructions expressly referred to relying on a single witness to prove a fact or a crime and included language suggesting that their provisions might not apply universally.

By contrast, the statute of limitations instruction expressly addressed itself only to the statute of limitations findings.  It identified the four elements to be proved and the applicable standards of proof.  The instruction specified that the fourth element required proof of independent evidence corroborating the victim's allegation and that the corroboration must be proven by clear and convincing evidence.

As the Attorney General points out, Ash's assertion that the jury would ignore the explicit parameters of proof set forth in the specific instruction for the statute of limitations allegation—and instead revert to CALCRIM Nos. 301 and 1190—is not reasonable.  When considered together with the statute of limitations instruction, it is apparent the jury would regard CALCRIM Nos. 301 and 1190 as instructions directed to their determination

15

of guilt on the two crimes at issue, and that the jury would consider the separate specific instruction for its determination on the statute of limitations allegation.

Additionally, CALCRIM No. 1190 expressly confined its application to the determination of guilt by stating the testimony of a single complaining witness could be sufficient to establish the defendant was guilty of a charged sex offense. Further, the statute of limitations instruction did not incorporate CALCRIM Nos. 301 or 1190 in its directions to the jury on how to resolve the statute of limitations allegations. Rather, it expressly contemplated that the jury first make a guilt determination: "If you find the defendant guilty of the crimes charged in Counts One and/or Two, pursuant to Penal Code section 803(f), you must then decide whether, for each of those crimes, the People have proved the following factual allegations." The instruction then continued by setting forth the standards of proof required for each of four separate findings and clearly explained that corroborative evidence was necessary for the finding involving whether the victim actually was molested.

Given such clear direction, we do not agree with Ash that CALCRIM Nos. 301 and 1190 could have been used by the jury for the special factual allegations of the statute of limitations. Rather, a reasonable jury would recognize that CALCRIM Nos. 301 and 1190 set forth rules on single witness testimony that applied to the criminal convictions, while the special instruction on the statute of limitations set forth specific rules on the necessity of corroboration for that set of limited factual findings. (See e.g., *People v. Noguera* (1992) 4 Cal.4th 599, 630–631 [rejecting argument that CALJIC No. 2.27, instructing the jury that the testimony of a single witness is sufficient to prove any fact, would confuse the separate requirement, set

16

forth in CALJIC No. 3.11, that accomplice testimony must be corroborated in order to convict].)

Critically, as the instructions stated and the prosecution and trial court discussed, section 803, subdivision (f)(2)(C), which tolls the statute of limitations for child sex abuse crimes, has no impact on the elements of the underlying offenses or the burden of proof placed on the prosecution to prove those crimes. Stated plainly, "the statute of limitations is not an element of an offense." (*People v. Smith* (2002) 98 Cal.App.4th 1182, 1194, see *People v. Riskin* (2006) 143 Cal.App.4th 234, 241 [the statute of limitations is not an ingredient of an offense but a substantive matter for which the prosecution's burden of proof is different].)

The statute of limitations instruction correctly informed the jury that if it found Ash guilty of the underlying offenses, it had to make the separate and additional findings for the statute of limitations allegation. The statute of limitations consisted of four elements, with the fourth requiring independent corroborating evidence. Thus, to find the statute of limitations allegation satisfied, the jury was properly instructed it could not rely on Doe's testimony alone. The instructions provided a straightforward explanation of this requirement, and Ash's arguments on appeal do not overcome the presumption that the jury is capable of correlating and understanding the instructions provided.

Further, both parties explained the distinction to the jury in closing argument. The prosecutor told the jury that Doe's testimony alone could prove beyond a reasonable doubt that Ash committed counts one and two. He then explained that if the jury found Ash guilty of the offenses, it would have to make findings on the additional allegations. He explained this included the statute of limitations, and that the fourth element required independent

17

evidence corroborating Doe's testimony.  The prosecutor gave as examples of independent corroborating evidence the instance in which Joya saw Ash licking Jane Doe's chest, the instance in which Laurie witnessed Ash having an erection while grabbing Doe's butt, and Christi's conversation with Doe about what Ash had been doing to her.  In his closing, Ash's counsel also explained the different requirements in the instructions and stated the statute of limitations instruction had a different standard of proof.

In sum, the trial court properly instructed the jury.  The instructions were correct statements of law, and it is not reasonably likely the jury misconstrued the instructions and failed to find sufficient corroborating evidence to prove element four of the statute of limitations allegation under the clear and convincing standard of proof.

IV

*Clear and Convincing Corroborating Evidence Instruction*

Ash next asserts that the court erred by providing the statute of limitations instruction because it diluted the corroborating evidence requirement.  Specifically, he argues the use of "tends" and "need not be strong" in the explanation of the meaning of corroborating evidence could have suggested to the jury it need not find corroborating evidence by clear and convincing proof.  We disagree.

As an initial matter, Ash did not object to the court's inclusion of the definition of corroborating evidence in the statute of limitations instruction.  Accordingly, he forfeited this argument for purposes of appeal.  Even if not forfeited, however, we hold the argument lacks merit.

The statute allowing for tolling of the statute of limitations, section 803, subdivision (f)(2)(C), requires "independent evidence that corroborates the victim's allegation."  The provision states, "[I]f the victim

18

was 21 years of age or older at the time of the report, the independent evidence shall clearly and convincingly corroborate the victim's allegation." (§ 803, subd. (f)(2)(C).) Section 803 does not define corroborating evidence or the clear and convincing evidence standard. Therefore, the trial court added these definitions and instructed the jury on corroborating evidence and clear and convincing evidence thusly: "You must also decide whether, for each crime the People have proved, there is independent evidence, not including the opinion of a mental health professional, that clearly and convincingly corroborates Jane Doe's allegation. [¶] Corroborating evidence is evidence that tends to connect the defendant with the commission of the crime. Corroborating evidence need not be strong or even enough to establish each element by itself. Corroborating evidence may include any circumstance that tends to connect him to the crime. [¶] Clear and convincing evidence of the corroboration means evidence of such convincing force that it demonstrates, in contrast to the opposing evidence, a high probability of the truth of the facts for which it is offered as proof. Such evidence requires a higher standard of proof than proof by a preponderance of the evidence. [¶] If the People have not met the burden of proving this allegation by clear and convincing evidence, you must find that the allegation has not been proved."

These definitions were correct statements of the law. (See *People v. Jasso* (2025) 17 Cal.5th 646, 685 [Corroborating evidence is evidence that "tends to connect the defendant with the crime."]; *People v. Baskins* (1946) 72 Cal.App.2d 728, 731 [Corroborating evidence "need not be strong."]; *In re Angelia P.* (1981) 28 Cal.3d 908, 919 ["Clear and convincing" evidence requires a finding of high probability]; *Conservatorship of Maria B.* (2013) 218 Cal.App.4th 514, 529 ["the clear and convincing evidence standard is higher than the preponderance of the evidence standard"]; and CALCRIM

19

Nos. 334, 335, 376, 441, 1111, 2240, 2241, 3450, 3453.) Thus, the definitions were properly included in the statute of limitations instruction to assist the jury in understanding what qualified as corroborating evidence and the applicable clear and convincing standard of proof.

Ash argues there is no basis in section 803, subdivision (f)(2)(C) or the case law concerning this statute to include the definition of corroborating evidence in the instruction. As the Attorney General points out, however, this argument ignores that "[t]he trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744, overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919.) Indeed, a definition of corroborating evidence is commonly included when the term is used in an instruction. (See *People v. Avila* (2006) 38 Cal.4th 491, 562–563 [corroborating evidence and accomplice testimony].) Because section 803, subdivision (f)(2)(C) uses the term corroborating evidence, the trial court appropriately defined the term for the jury.

Ash also argues the use of the terms "tends" and "not strong" diluted the clear and convincing evidence standard. This argument, however, presumes without factual support that the jury could not distinguish between the definition of corroborating evidence and the clear and convincing standard of proof. Ash fails to " 'credit jurors with intelligence and common sense' [citation] and presume they generally understand and follow instructions." (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.) Merely asserting the instructions are unclear does not show a reasonable likelihood the jury interpreted the instructions as he suggests. (*People v. Solomon* (2010) 49 Cal.4th 792, 822; *People v. Cross* (2008) 45 Cal.4th 58, 67–68 ["A

20

defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant."]; *People v. Carrington* (2009) 47 Cal.4th 145, 192 ["[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."].)

The two paragraphs in the instruction defined and explained two different concepts. The instruction explained that corroborating evidence is a type of evidence that supports or confirms other evidence or testimony. In this case, corroborating evidence, i.e., evidence that tended to confirm or strengthen Doe's testimony, was required. The instruction also explained the clear and convincing standard, informing the jury that the evidence of corroboration was required to be highly probable or reasonably certain. As with Ash's arguments concerning the instructions related to a single witness testimony, it is unreasonable to assume the jury was incapable of understanding the difference between corroborating evidence and the applicable standard of proof.

Moreover, before defining corroborating evidence, the court reminded the jury that the prosecution was required to provide independent evidence "that clearly and convincingly corroborates Jane Doe's allegation." And after defining corroborating evidence and the clear and convincing standard, the court again reminded the jury that the prosecution had to prove the statute of limitations allegation by clear and convincing evidence. The instructions repeatedly told the jury it must apply the clear and convincing evidence standard to prove the statute of limitations allegation. When considering the entirety of the instructions, as we must, rather than parsing a few words from the definition of corroborating evidence, there is nothing confusing or

21

contradictory about the instruction.  Ash has not shown that the instruction given was in error.[3]

DISPOSITION

The judgment is affirmed.


McCONNELL, P. J.

WE CONCUR:


BUCHANAN, J.


CASTILLO, J.

---

[3]     Ash also argues reversal is required because the cumulative effect of the asserted errors deprived him of a fair trial.  Because we conclude there was no error, this argument is moot.